# Richmond

## CITY OF RICHMOND *v.* HOOD RUBBER PRODUCTS COMPANY, INCORPORATED.

March 11, 1937.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

12

The opinion states the case.

*James E. Cannon* and *Ordway Puller*, for the plaintiff in error.

*John H. Bocock* and *McGuire, Riely & Eggleston*, for the defendant in error.

GREGORY, J., delivered the opinion of the court.

The Hood Rubber Products Company, Incorporated, instituted an action against the city of Richmond for damages alleged to have been occasioned by the breaking of one of the city's water meters, through which leaked large quantities of water that ran into the basement of the property occupied by it, and materially damaged quantities of leather, rubber goods, thread, etc. The trial in the lower court resulted in a verdict and judgment in favor of the Hood Rubber Products Company, Incorporated, which will be referred to as the company.

The facts in the case are practically uncontradicted. For many years prior to the time of this occurrence, the city of Richmond had been engaged in conducting its own water system and in the sale of water to its consumers. The leak in the meter occurred on the 7th day of June, 1934, at which time the city had approximately 45,000 water meters in use.

In the early part of 1934, the company had leased the premises known as 824 West Broad street for the establishment of a branch office for the conduct of its business of dealing in leather and rubber goods, shoe polish, threads, etc. The company was furnished water service to supply a lavatory and washstand in the building. It was furnished through a main which was located in Broad street. A service

pipe was connected with this main and it carried water from the main to the meter which was located about 18 inches below the ground, under the sidewalk and near the curb. After the water passed through the meter it continued through the service pipe under the sidewalk and into the basement of the building where pipe connections to the lavatory and wash-stand were made.

The floor of the basement of the building was of dirt and the company stored its goods there. The goods were packed upon pieces of timber which were laid upon the floor.

On the morning of June 7th, Mr. J. T. Ellis, Jr., the branch manager for the company, went into the basement and found it dry and in good condition, just as it had been since the time the company began its occupancy of the property. About three o'clock that afternoon, Mr. Ellis went into the basement again and found water running through numerous openings in the front wall of the build-ing into which the service pipe from the meter entered. He also found water of considerable depth standing in the base-ment. He immediately notified the city water department of this condition and within 10 minutes after the notice had been given, an employee of this department cut the water off at the meter and thereby immediately stopped the flow of the water into the basement. The meter was discon-nected from the service pipe and removed and a new meter installed.

An examination of the meter disclosed that two of the bolts and washers holding the bottom to the meter had given away and caused the bottom to crack; that the washers had rotted; the gasket between the bottom and the meter had blown out on one side; and through this opening the water flowed through the earth, through the basement wall and into the basement.

At the conclusion of the evidence of the company and also at the conclusion of all the evidence, counsel for the city moved to strike it on the ground that there was no evi-dence on which a verdict for the company could be sup-

ported. These motions, however, were overruled. This ruling of the trial court was made the basis of one of the assignments of error.

The other assignment involved the correctness of the ruling of the court in refusing the first instruction offered by the city, amending and granting it. The instruction as offered read as follows:

"The Court instructs the jury that in order to hold the defendant liable for a defect in its water meter, it must be shown that the city had actual or constructive notice of the defect which caused the damage and had a reasonable time to repair it or guard against any damage that might reasonably be expected to result therefrom after having such notice; and that by constructive notice is meant that the defect by which the damage is alleged to have been caused, had been so open and notorious and continued for such a length of time before the alleged damage, that the city, by its proper officers, exercising ordinary care, should have acquired knowledge of such defect."

The amendment consisted in striking out this language, "had been so *open and notorious* and continued for such a length of time before the alleged damage," and inserting in its place the following, "*had existed* and continued for such a length of time before the alleged damage."

The sole allegation of negligence in the notice of motion was that the city had maintained a defective meter. It was not alleged that it had been improperly installed, or that the city had failed to inspect it.

In its grounds of defense the city denied that it was guilty of negligence. It also denied that the meter was defective but claimed that if it were defective, the defect was latent, and could not have been discovered by the exercise of ordinary care and that the city had no notice of any defect or of any water in the basement until three o'clock in the afternoon of June 7th, and within ten minutes thereafter the water was turned off.

Under the pleadings, the issue made was (a) whether the city maintained a defective meter, and (b) if so, did the

city have notice of it. At the trial the evidence established that the meter was defective. The washers had rotted, the gasket had "blown out" and the bottom had cracked and given away. The only remaining essential necessary to fix liability upon the city was the establishment of notice to it, either actual or constructive. In other words, if the city knowingly maintained a defective meter at the premises in question it was liable for the damage done by the water leaking through it and into the basement.

The court below refused to apply the doctrine of *res ipsa loquitur* and we agree that the doctrine has no application. To justify its application here required a showing that the instrumentality (the meter) was under the exclusive control of the defendant. This was established. In addition it was necessary that the cause of the accident be unexplained or unidentified, because it is only where the cause of the accident has not been ascertained that a necessity for the application of the doctrine arises. It applies where the injured person is powerless to ascertain the cause. In the case at bar the cause of the injury to the company was ascertained. It was shown to be a defective meter which permitted the escape of water. The defect was clearly established by the evidence. 20 R. C. L., page 187; 45 Corpus Juris, pages 1205 and 1206.

In *Peters* v. *Lynchburg Light & Traction Company*, 108 Va. 333, 61 S. E. 745, 746, 22 L. R. A. (N. S.) 1188, the court said: "The doctrine rests upon the assumption that the *thing* which causes the injury is under the exclusive management of the defendant, and the evidence of the true cause of the accident is accessible to the defendant and inaccessible to the person injured. *Ross* v. *Double Shoals Cotton Mills*, 140 N. C. 115, 52 S. E. 121, 1 L. R. A. (N. S.) 298; Greenleaf on Ev. (Wigmore) section 2509; 1 Shear. & Red. on Neg., section 59."

In *Norfolk Coca-Cola Bottling Works, Inc.* v. *G. Krausse and E. L. Bowen*, 162 Va. 107, 173 S. E. 497, 499, it is said: "We have held that it (*res ipsa loquitur*) is an evidential presumption sometimes resorted to in the absence of evidence,

but that it is not to be applied when evidence is at hand. *Riggsby* v. *Tritton*, 143 Va. 903, 129 S. E. 493, 45 A. L. R. 280; *Chesapeake & O. Ry. Co.* v. *Baker*, 149 Va. 549, 140 S. E. 648, 141 S. E. 753; (on rehearing) *Id.*, 150 Va. 647, 143 S. E. 299. Here evidence is at hand and the doctrine does not apply."

In Virginia the doctrine, if not entirely abolished, has been limited and restricted to a very material extent. (See *Chesapeake & O. Ry. Co.* v. *Tanner*, 165 Va. 406, 182 S. E. 239, and *Virginia Electric and Power Company* v. *Lowry*, 166 Va. 207, 184 S. E. 177.)

It is conceded that the city in conducting its water plant and in supplying water for domestic and commercial purposes to its consumers is engaged in such undertaking in its private capacity. It is also conceded that in operating its water business the city is not an insurer and that before one can recover damages for injuries to property occasioned by a leaking or bursted meter or water pipe it is essential that negligence in the contruction or maintenance of the defective meter or water pipe be established. 27 R. C. L., pages 1400 and 1401; *Mann Bros.* v. *Henderson*, 154 Ky. 154, 156 S. W. 1063; *Littlefield* v. *Newport Water Co.*, 110 Me. 129, 85 A. 482; *McCord Rubber Co.* v. *St. Joseph Water Co.*, 181 Mo. 678, 81 S. W. 189; *Esberg Cigar Co.* v. *Portland*, 34 Ore. 282, 55 P. 961, 43 L. R. A. 435, 75 Am. St. Rep. 651; *City of Paris* v. *Tucker (Tex. Civ. App.)*, 93 S. W. 233; *Rice* v. *St. Louis*, 165 Mo. 636, 65 S. W. 1002.

When we advert to the allegation in the notice there was no charge of faulty construction or installation. The sole charge was the maintenance of a defective meter. There is no evidence which shows that the meter was improperly installed. It was placed 18 inches under the sidewalk, in the ground and in a regular meter box. There is no evidence which tells us that this was improper installation. In fact, it is common knowledge that great numbers of water meters are placed under the sidewalk in the ground in our cities just as this one was placed. This is common and approved practice.

It is claimed that the meter was not tested and inspected before it was installed. There was no charge in the notice of a failure on the part of the city in this respect. However, the evidence discloses that the meter in question was tested at the shop before it was installed and it did not leak when the pressure of the city water main was applied. The evidence also shows that the meter was inspected before installation but that it was not opened up. Cities usually rely upon the manufacturer's test.

It is urged here but was not alleged in the notice that the city should have inspected the meter after it had been installed and that if proper inspection had been made the defects would have been disclosed.

The meter was installed in 1922 and had been in continuous use. It was purchased of a reliable manufacturer. It was of standard make and of the type used in many cities. It was known as the "Watch Dog Meter." It complied with the specifications of the American Water Works and the New England Water Works Associations. Approximately two million of them were in use at the time of the injury here. There being no wear upon that part of the meter where the leak occurred, its life is indefinite.

There was an entire absence of any evidence which would show or even tend to show that the common usage or good practice of other municipalities or water companies engaged in a similar business, supplying a similar service under substantially similar conditions, required an inspection of a water meter after installation.

Likewise, there was an entire absence of any evidence which tended to show the existence of a single circumstance or condition, which if followed would have disclosed the defect. It would not be reasonable to hold the city liable for a failure to inspect its meters when it has not been shown either that good practice required an inspection or what would be a fair standard of inspection.

It is emphatically stated by counsel for the company that the "unbending test" of negligence has been abolished in Virginia, and *Jeffress* v. *Virginia Railway and Power Com-*

*pany*, 127 Va. 694, 104 S. E. 393, and *Roberts* v. *Southern Railway Company*, 151 Va. 815, 144 S. E. 863, 145 S. E. 255, are cited to support his statement. It is true that this court refused to apply the principles of the "unbending test" in those cases but we do not construe the language used in the opinions to mean that in no case will the principle be applied.

In *Roberts* v. *Southern Railway Company*, *supra*, 151 Va. at page 838, 145 S. E. 255, upon petition for rehearing the court handed down its opinion, enlarging upon and changing in some respects the opinion which had been previously handed down. The court said: "The rule as to the unbending test is variously phrased, but it may be said to be that the test of negligence in methods and in the character of the machinery and tools and apparatus used or furnished by the master is the general custom or ordinary usage in vogue among others engaged in the same business, so that the standard of due care is the conduct as to these methods of the average prudent man in the business. The three most recent Virginia cases are *Jeffress* v. *Virginia Railway and Power Company*, 127 Va. 694, 104 S. E. 393; *Southern Railway Company* v. *Chadwick*, 144 Va. 443, 132 S. E. 191; and *Atlantic Coast Line Railroad Company* v. *Bell*, 149 Va. 720, 141 S. E. 838. From these cases and earlier cases on the subject it will be seen that the application of the rule to a given set of circumstances may be conclusive of the right of recovery, or it may not be."

In the *Roberts Case* the evidence tended to show that there intervened the negligence of another employee and that the usual and customary plans for repairing the bridge were not followed. This statement is indicated from this language taken from the opinion, page 839 of 151 Va., page 256 of 145 S. E.: "Still it can scarcely be said that it was unusual, upon an exact adherence to the customary methods and plans, for the bridge, under such circumstances as those in the instant case, to be precipitated and fall. It is rather to be said that the bridge would not fall if the customary plans had been attentively carried out without neglect. This is not a case in

which the application of the unbending test doctrine governs entirely, as is very frequently properly ruled under other circumstances. If an employer equips his factory in a manner similar to good factories of like character elsewhere and an accident occurs to a servant notwithstanding, it may be said that the master has done all that is required of him. In the case here the question is whether a negligent act was done by employees under the direction of a foreman which caused the bridge to fall."

In the case of *Jeffress* v. *Virginia Railway and Power Company*, *supra*, the court was dealing with electricity. Electricity is known to be inherently dangerous and the company transmitting it is held to an unusually high degree of care, whereas municipalities and water companies in supplying water to their customers are not dealing with a commodity which is dangerous in itself and they are required only to exercise ordinary care.

In *Virginia Electric and Power Company* v. *Lowry*, *supra*, and *Chesapeake & Ohio Railway Company* v. *Tanner*, *supra*, the unbending test was in effect applied.

The trial court gave instruction C. The company interposed no objection to it. The court by this instruction gave to the jury the test of ordinary care which was applicable to this case. A portion of it reads: "The test of ordinary care in such a case is the common usage and practice of other like companies or municipalities engaged in a similar business." This instruction became the law of the case. It fixed the standard of ordinary care and the evidence failed to disclose that the meter in question had not been installed and maintained in accordance with the requirements of common usage and good practice of other like companies or municipalities performing a like service under substantially like conditions. The burden was upon the company to prove what common usage required in cases of this kind as a standard of ordinary care and also to prove that the city had failed to measure up to that standard. The company failed in that respect.

We are of opinion that the assignment of error to the action of the court in amending the first instruction

offered by the city is well taken. The instruction has been previously set out in full. It was imperative that the company show that the city had some knowledge of the defective meter. This knowledge could have been brought to it either by actual or constructive notice. It is conceded that there was no actual notice. As we have seen, the instruction, as offered, would have told the jury that if the defect was "open and notorious" and had continued for such a length of time that the city through its officers should have acquired knowledge of the defect, this would be sufficient to charge the city with notice. The court below by its amendment charged the city with knowledge of the defect if it had *existed* for such length of time that the city through its officers should have acquired notice. We think the court was in error in so amending the instruction. A defect may have existed for a great length of time and could not have been detected by any kind of inspection. The instruction would charge the city with notice of latent and hidden defects in its water system. The test is not the length of time the defect may exist. It is, to use the language of the attorney for the city, "the susceptibility to discovery" and the length of time the defect may exist that would be sufficient to charge the city with notice.

The evidence discloses that the meter was read every month and it also discloses that there was nothing unusual about its appearance. No circumstance appeared which would charge the city with making an investigation of the meter. It was functioning properly. Our conclusion is that the instruction as offered by the city should have been given. It correctly stated the law of constructive notice as applicable to this case.

It is not necessary to review all of the cases cited and re-lied upon. Some of them are: *Haas et al.* v. *City of New York*, 107 Misc. 427, 176 N. Y. S. 433; *Wimpfheimer et al.* v. *City of New York*, 184 App. Div. 494, 171 N. Y. S. 701; *Palmer Advertising Service, Inc.* v. *Grinnell Co.*, 247 App. Div. 765, 285 N. Y. S. 647; *Southern Pacific Co.* v. *City of Los Angeles* (Cal. App.), 26 P. (2d) 896.

In the case of *Imperial Candy Co. et al.* v. *City of Seattle*, 93 Wash. 145, 160 P. 303, an action was brought for damages to personal property caused by the breaking of a water main, and resulted in a finding against the city. The water main was so installed that a four inch pipe was connected with a three inch pipe and it was at this point that the pipe broke. Near this point was a meter and it was supported by an insecure foundation made of boards. The precarious situation was apparent to a person reading the meter. Access to the pit in which the meter was placed was made through an opening in the sidewalk through which the meter reader entered the pit.

The court held the city liable because the defect in the foundation under the meter was readily ascertainable.

Another case somewhat similar to the case at bar is *A. J. Brown and Son, Incorporated* v. *City of Grand Rapids*, 265 Mich. 465, 251 N. W. 561, 562. A break occurred in an elbow of the lateral main and as a result a large flow of water eventually lodged in the basement of the plaintiff's premises causing serious damage to a stock of seeds. The court held that the doctrine of *res ipsa loquitur* did not prevail in Michigan and that the plaintiff had failed to prove that the city was in any way negligent in omitting to perform a duty. The court said: "Plaintiff falls back upon the contention that there were no proper tests or inspections conducted by the city, but suggests no reasonable tests or methods of inspection. The testimony reveals with certainty that there were no similar breaks in the near vicinity. If it was incumbent upon the city to make such tests and inspections as are demanded by plaintiff, at places where there had been no previous trouble, it would mean that the city would constantly be obliged to dig up its streets and inspect its water mains. The further question arises as to how frequently in that eventuality, such inspection should be made. If the city should apply the knife test to all of its mains after they were exposed by excavations and a leak should occur shortly thereafter as a result of electrolysis, would the city be responsible for improper inspection? The expense of main-

taining a system under those circumstances would be such as to make the cost of supplying water almost prohibitive.

"While there are cases in some jurisdictions which hold the city liable for breaks in water mains without making it incumbent upon the plaintiff to show the cause thereof, an examination discloses that most of them have been decided in jurisdictions in which the doctrine of *res ipsa loquitur* prevails. We believe that the correct rule is stated in *Simon* v. *City of New York*, 82 Misc. 454, 143 N. Y. S. 1097, 1098 (quoted in McQuillin, Municipal Corporations (2d Ed.) §2852): 'In all the sewer or water main cases cited by the plaintiff, in which the city was held liable, there was either evidence of actual neglect in the construction or operation of the water main or sewer, or notice to the city authorities of the break or overflow, accompanied by neglect on their part to repair promptly, or actual notice, by reason of like prior occurrences, that the sewer or pipe were defectively * * * * maintained. * * * * A municipality is not an insurer of its water or sewer system, any more than of its streets. It is required only to use reasonable care in establishing and maintaining such a system.' See also, *Jenney* v. *City of Brooklyn*, 120 N. Y. 164, 24 N. E. 274; *Philadelphia Ritz Carlton Co.* v. *City of Philadelphia*, 282 Pa. 301, 127 A. 843; *Schindler* v. *Standard Oil Co. of Indiana*, 207 Mo. App. 190, 232 S. W. 735."

We are of opinion that in the case at bar no actionable negligence has been shown against the city in the installation and maintenance of the water meter in question, and, therefore, the judgment of the trial court should be reversed and final judgment now entered in favor of the city.

*Reversed.*

CAMPBELL, C. J., concurring in result.