# Wytheville.

## MARGUERITE HENLEY, AN INFANT, v. W. L. MASON.

### June 12, 1930.

Absent, Holt and Epes, JJ.

The opinion states the case.

*O. M. Selph, R. Dixon Powers* and *Leon M. Bazile.*
for the plaintiff in error.

*Robt. H. Talley* and *Parrish & Butcher*, for the defendant in error.

CAMPBELL, J., delivered the opinion of the court.

Plaintiff in error (plaintiff in the court below), an infant fifteen years of age, by her next friend, brought her action of trespass on the case against the defendant, W. L. Mason, alleging in her notice of motion negligence and lack of skill in the performance of a tonsil operation upon her. The allegation of the notice upon which recovery is based is that the defendant "did perform said operation for the sole purpose of removing my tonsils, in which operation you and * * * your servants * * * did by your failure to use due and proper care, and by your lack of skill and that of your agents * * * knock out, extract, push out, or in some careless and negligent manner, cause to be knocked out, pushed out, extracted, or in some manner cause the loss of two of my front teeth."

There was a verdict for the plaintiff which, upon motion of the defendant, was set aside by the trial court on the sole ground that the evidence was insufficient to support it, and judgment was entered for the defendant. This action of the court is assigned as error.

█ The general principles of law applicable to the questions involved in the instant case have been laid down by this court in *Hunter* v. *Burroughs*, 123 Va. 113, 96 S. E. 360; *Fox* v. *Mason*, 139 Va. 667, 124 S. E. 405. The general doctrine supported by the great weight of authority is to the effect that a physician or surgeon is not an insurer of a cure, or even of beneficial results, unless he has bound himself by special contract to effect a cure. If there be no special contract, then

the law imposes upon him the duty of exercising the highest degree of diligence and skill which is common to and exercised by the average member of the profession in good standing in similar localities and in the same general line of practice.

It is also a well settled rule of law that unless the doctrine of *res ipsa loquitur* is clearly applicable, then the standard for the measure of the skill exercised by the physician or surgeon is not to be left to the whim or caprice of a jury upon non-expert evidence, but is to be shown or judged by the testimony of medical experts of good standing in the same line of practice. Were the rule otherwise, it would open wide the avenue of harassment and subject the medical practitioner to a handicap too hazardous to carry.

The opinion of the late Mr. Chief Justice Taft (then a United States Circuit Judge), in *Ewing* v. *Goode*, 78 Fed. 442, 443, when read in connection with *Hunter* v. *Burroughs*, *supra*, we think clearly states the rule obtaining in this State. In the *Ewing Case* it is said: "A physician is not a warrantor of cures. If the maxim *'res ipsa loquitur'* were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

In her petition for a writ of error plaintiff urges upon us the application of the doctrine of *res ipsa loquitur*. A careful study of the record leads us to the conclusion that the doctrine invoked is not applicable when viewed in the light of the facts of this case. The allegation of the notice of motion is that the defendant, in performing a tonsil operation, failed to use due and

proper care, and by reason of a lack of skill knocked or pushed out two of plaintiff's front teeth. The action is based primarily upon the negligent performance of a tonsil operation. In all tort actions the basis of recovery is negligence.(1) The burden was upon the plaintiff to show that the injuries complained of resulted from the negligence of the defendant.

■ The sole question involved in the assignment of error is whether the evidence, considered as a whole, is sufficient to sustain the verdict of the jury. The contention of the plaintiff is that the evidence shows conclusively that the defendant, in preparation for the tonsil operation, inserted a metal gag in plaintiff's mouth in an improper manner, and that at the time he was inserting the gag he was looking in an opposite direction from plaintiff, and as a result of this inattention the plaintiff lost her teeth.

The case made out by the defendant may be summarized thus: The parents of the plaintiff employed Dr. W. L. Mason, a specialist in nose and throat conditions, to remove the tonsils of the plaintiff. On July 27, 1926, the plaintiff was prepared for the operation and brought to the operating room and placed on the table. The anaesthetist proceeded to adminster ether in the usual manner, greasing the face, covering the eyes, placing a cone over the face and applying the anaesthetic by the drop method. The administration of the ether through the cone continued to a point where the patient was sufficiently anaesthetized to proceed with the next step in the operation, which was to insert a metal gag to hold the patient's mouth open during the operation. The gag was of the type in customary and approved use, and consisted of two flanges pressing against the upper and lower teeth and connected by a spring which held the teeth open, and could

■

only be released by depressing a spring or lever. In other words, the spring in the gag allowed the gag to open wider as the patient's mouth opened, but once opened, it would not close except by a pressure from the person inserting the gag. Biting down on the gag by the patient would not close the gag, as the purpose of the gag was to hold the mouth open.

It was shown that it is not the usual and approved practice to wait for the insertion of the gag until the patient is completely anaesthetized, as it is extremely difficult to get the patient's mouth open at this point, but that the usual and approved practice in performing the operation for the removal of the tonsils is to insert the gag at a certain time in the anaesthesia, when, in the judgment of the physician, the condition is deep enough to proceed, but not too deep to cause such rigidity of the jaws as would prevent the insertion of the gag. Immediately after the gag is inserted between the teeth a rubber or metal tube is inserted and ether is then sprayed through the tube into the patient's throat by means of a motorized apparatus, and the anaesthetization is completed in this manner. It was shown by all the expert testimony that at this stage of the operation, i. e., when the patient has been partially anaesthetized, the gag inserted, the tube inserted and the spray started, the ether spray in the throat invariably stimulates the muscles of the jaws, throat and mouth, and causes motions of the muscles of the jaw, throat and mouth and a chewing or biting down on the gag. The amount of stimulation to those muscles, resulting in chewing or biting, is determined by the individual equation and cannot be foretold in advance. All the expert witnesses testified that this chewing down on the gag is invariably present and is not ordinarily the cause for any concern. It was shown that the chewing is

sometimes so violent that where practicable or possible the surgeon may remove the gag, but it was further shown that on account of the flanges on the gag being caught behind the upper and lower rows of teeth it is not always practicable or possible to remove it.

It is further shown that the defendant, Dr. Mason, proceeded with the operation in the customary and usual manner after the cone had been removed from the face. The ether spray caused the usual stimulation of the muscles and plaintiff chewed down on the gag. Dr. Mason testified as to what happened thereafter, and his testimony is not disputed in any particular. He stated that there is always considerable gagging and chewing down when the ether machine starts; that he, in order to keep the gag from dropping out (because sometimes the patient chews down and then opens the mouth and chews down again), always held his hand on the gag at this stage. He further testified that it was just at this stage that the young lady chewed down and her tooth buckled forward. It did not drop down from the pressure of the jaws coming together. The first tooth bulged out so far that it practically lay loose on the lips, and defendant took his finger and took that tooth out; and as the other tooth was liable to come out and go down the patient's throat and enter her wind-pipe he took that out also and proceeded to remove the tonsils.

It was shown by the testimony of many experts that the method pursued by Dr. Mason in preparing to per-form and in performing the operation was the usual and approved method and exactly the same method and technic used by the best surgeons in Richmond and vicinity. It was also shown that it was an accepted fact in the medical world that teeth of both adults and children are sometimes lost by the use of the gag, and

that this is an ordinary surgical risk which accompanies the operation and which there is no known method to prevent.

As we view the matter there is but little, if any, conflict in the evidence and we are unable to concur in the view that the evidence conclusively, or even remotely, shows that defendant was negligent in the particulars relied upon. It is stated in the petition: "It also appears from the testimony of defendant's witness, Miss Gayle, which is contradicted only by the testimony of the defendant, that petitioner's teeth were broken off at the time the gag was forced in her mouth and before there had been any movement by her jaws." A complete refutation of the conclusion drawn from the testimony of Miss Gayle is, we think, found in her statement as follows:

"Q. Miss Gayle, will you kindly state what your occupation is?

"A. I am a graduate nurse of Stuart Circle Hospital.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. Who performed the operation in the case?

"A. Dr. Mason.

"Q. Were you present when the injury occurred to the plaintiff that she is complaining of, namely, two teeth coming out?

"A. Yes, sir.

"Q. Can you describe to the jury what happened, so far as you know?

"A. So far as I remember, when they took the cone off her face to put the ether tip in, before they put the tip in they put the gag in, and at that time the teeth dropped out.

"Q. Did you see what happened?

"A. Yes. The teeth protruded and one dropped out

and the other was loose and had to be removed. Dr. Mason said he would rather remove it than run the risk of its getting in the windpipe.

"Q. What movement, if any, was made on her part to cause that to happen?

"A. None that I know of.

"Q. Could you account for it at that time?

"A. No, I could not.

"Q. Had the gag actually been inserted in her mouth at that time?

"A. Yes, it had.

"Q. How close were you to the patient all the time in the room?

"A. At the time that happened I was very close to the patient. I stood on the left hand side of the table that she was on.

"Q. Did anybody use any instrument and strike her teeth, or anything of the kind?

"A. No, they did not.

"Q. Did Dr. Mason in any way make a slip and knock any instrument against her teeth? Was there anything of that character?

"A. No, he did not do it; no.

"Q. Had you seen many of these operations performed up to that time?

"A. Yes, I had.

"Q. And there was nothing unusual in this operation?

"A. Nothing.

"Q. Had you seen Dr. Mason perform that operation before?

"A. Yes, sir; I had.

"Q. For removing tonsils?

"A. Yes, I had.

"Q. Had you seen other doctors perform that operation?

"A. Yes, I had.

"Q. How many, up to that time?

"A. Well, I had seen quite a few. I don't know how many.

"Q. Did you see any difference between the way Dr. Mason operated and the way the others operated?

"A. No, I did not."

The further contention that the defendant was negligent in failing to use due precaution after the insertion of the gag into the mouth of plaintiff is also untenable. Upon that point the defendant testified thus:

"Q. Do you mean to tell the jury that after the gag was in her mouth you took time to look around?

"A. Probably to the ether machine or to look at her face.

"Q. How far was the ether machine from the patient?

"A. On the other side.

"Q. So if you looked at the ether machine, you did not look at her mouth, did you?

"A. I looked at her mouth and saw her teeth coming down.

"Q. And then you looked at the ether machine?

"A. Yes.

"Q. Why didn't you take the gag out before you looked at the ether machine?

"A. Because ninety percent of them bite on them. We don't pay any attention to that.

"Q. Do you mean to say that you put that thing in a patient's mouth and let the patient bite down on it and pay no attention to it?

"A. Exactly so.

"Q. Do you do that in all of your operations?
"A. Everybody does."

It further appeared from the testimony of expert witnesses that it was just as essential to keep watch upon the functioning of the ether machine as it was to keep watch upon the patient. No inference of negligence can be drawn from the momentary glance of defendant at the ether machine. To do so would be to hold that it was more important to protect the teeth of the patient than to guard against possible demise from an over-inhalation of ether.

█ Upon the whole case, we are of the opinion that it is equally as probable that the accident occurred as an incident of the operation, without negligence on the part of the defendant, as that it may have occurred as a result of his negligence. This being true, it necessarily follows, in the absence of affirmative proof of defendant's negligence, that no error was committed by the trial court in setting aside the verdict of the jury and entering judgment for the defendant.

*Affirmed.*