# Staunton

## DANVILLE COMMUNITY HOSPITAL, INC. v. LINDA THOMPSON, AN INFANT, ETC.

September 3, 1947.

Record No. 3226.

Present, Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Meade & Talbott*, for the plaintiff in error.

*R. Paul Sanford* and *J. William Clement*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

The plaintiff, Linda Thompson, an infant four and one-half years old, sued the defendant, Danville Community Hospital, Inc., for damages for a burn suffered by her on

March 17, 1942, at the time she was born in the defendant hospital.

Her notice of motion alleged that in disregard of the duty of ordinary care owed to her, the defendant "negligently placed hot applications, or a lamp or lamps for the purpose of generating heat, on my left buttock and as a direct and proximate result thereof I sustained a bad burn and * * * a most disfiguring and permanent scar was left on my left buttock, which at times becomes irritated and as I have grown it has been a constant source of annoyance and discomfort to me."

The hospital defended on the ground that it was a charitable institution and owed to the plaintiff only the duty to exercise reasonable care in the employment of its nurses and other employees (*Norfolk Protestant Hospital* v. *Plunkett*, 162 Va. 151, 173 S. E. 363); that the burn resulted from treatment prescribed by the attending physician of plaintiff's mother, for whose negligence it was not liable; and that the defendant was not guilty of any negligence.

The issue was tried by a jury which returned a verdict for the plaintiff for $5,000, upon which the court entered judgment, and the defendant obtained this writ of error. The defendant makes five assignments of error which present three questions, viz., whether the defendant was a charitable institution; whether the rule of *res ipsa loquitur* was applicable, and whether the verdict was excessive.

■ We think it clear that the defendant was not a charitable institution. It was a stock company chartered in the usual way, with a maximum capital stock of $50,000, divided into shares of $100 each. Its purposes are stated in its charter and include no suggestion of charitable objectives. The purposes stated were to buy and own real estate for hospital purposes and to operate a community hospital; to provide group hospital service to the residents of Danville and surrounding counties; to issue and sell stock certificates, providing for hospital service to the owner in addition to the regular attributes of stock certificates, and to sell contracts for hospital services.

Each share of stock entitled the owner to receive from the hospital annually a maximum of thirty days of hospital service without cost, subject to certain restrictions; and this, as stated, was in addition to the ordinary rights of stockholders. The right to receive dividends or additional benefits, was limited by a provision of the charter that:

"The earnings of the Corporation, if any, shall be reinvested for the benefit of the Corporation in any buildings, equipment, additional service to the stockholders, the creation of a reserve fund or funds, and in such other benefits to the Corporation as may be decided upon by the Board of Directors."

It is shown that there have been no profits or money dividends, that operation has been at a loss, and that in 1944 the city of Danville and some of the stockholders gave financial aid. But it is further shown that about fifty per centum of the approximately 450 stockholders have received hospital services by reason of their stock ownership and their accounts were charged against capital of the corporation. The hospital does not hold itself out as a charitable institution, but enters a charge against every patient and collects if it can. The trial judge asked the president of the corporation if this was not their method of operation:

"A man comes to the hospital with a broken leg. You take him in and enter a charge against him for your services. You try to get the money if you can; and if you can't get it, that is too bad. Doesn't that explain it?" The witness answered yes.

There have been charity patients, of course, in the sense that there have been patients unable or unwilling to pay their bills. But failure to make money or collect from some of the customers or patients is not sufficient to convert a private corporation into a charitable institution. Many corporations would be surprised to learn that such an experience produced such a result.

A hospital owned and operated by a corporation created by the voluntary agreement of private individuals,

which issues stock investing its stockholders with the usual rights and, in addition, the valuable right to free hospital services, is managed and governed by officers and agents selected by the stockholders, and enters a charge against its patients for its services which it collects when it can, is certainly not a charitable institution and not entitled to the immunities generally accorded to such institutions.

"Briefly, the test which determines whether a hospital is charitable or otherwise is its purpose, that is, whether or not it is maintained for gain, profit, or advantage. * * * * and the question as to its character may be determined not only from the powers and purposes as defined in its articles of incorporation or charter but also from the manner in which it is conducted, * * * * ." 14 C. J. S., Charities, sec. 2, pp. 422-23. And see 26 Am. Jur., Hospitals and Asylums, sec. 3, p. 588; *Washingtonian Home of Chicago* v. *Chicago*, 157 Ill. 414, 41 N. E. 893, 29 L. R. A. 798; *Fowler* v. *Norways Sanitorium*, 112 Ind. App. 347, 42 N. E. (2d) 415; *Hamilton* v. *Corvallis General Hospital Ass'n*, 146 Ore. 168, 30 P. (2d) 9; *Chapin* v. *Holyoke Y. M. C. A.*, 165 Mass. 280, 42 N. E. 1130.

The defendant moved to strike out the evidence of the plaintiff at its conclusion and again at the conclusion of all the evidence. The court overruled those motions and gave to the jury instruction B, telling them that defendant was not an insurer of plaintiff's safety, but that the basis of the action was negligence; that the burden was on the plaintiff to prove that the defendant was guilty of negligence which was the proximate cause of the accident; that if it was just as probable that the defendant was not negligent as that it was, then the jury should find for the defendant. This was followed by instruction B½ which is as follows:

"But where a person received injuries from some means or instrumentality in the control of the defendant which does not ordinarily occur where reasonable care is used by the defendant, and the injury occurs under such circumstances that the defendant should have the means of deter-

mining how it occurred and the cause thereof and the plaintiff does not have this information, then, the jury may infer that the injury was due to some negligence of the defendant. They are not obliged to draw such inference, but may do so. And in the absence of evidence satisfactorily showing freedom from negligence may find a verdict for the plaintiff. But on the whole case the jury must believe from the preponderance of the evidence that the injury was due to the negligence of the defendant, before they can find a verdict for the plaintiff."

The defendant objected to the instruction on the ground that the evidence was not peculiarly within the possession of the defendant, and that the injury might be attributed to one of two causes, for one of which the defendant was not responsible. The giving of that instruction is the basis of the main assignment of error, and its proper disposition requires a statement of the evidence.

The witnesses for the plaintiff were her father and mother and Dr. McMann, an obstetrics specialist, employed by the father to attend the mother at the birth of the child. The mother was admitted to the hospital March 14, 1942, and the baby was born during the night of March 17. It was a hard birth, but the baby was normal and without any injuries. Dr. McMann explained that it was the practice to treat the baby in the delivery room and then it was taken by a nurse to the nursery and there bathed, weighed and put to bed. It would be inspected frequently if there was any condition to warrant it, but he did not think there was any such condition in this case. The next day Dr. McMann was told by the nursery nurse that the baby had a blister. Upon examination he found a burn on the baby's thigh about as big as a silver dollar, which in his opinion was caused by a hot water bottle. He said it was a very common thing in a hospital to wrap up one or two hot water bottles and put them on either side of the baby to get the proper heat, and if that was done in a proper way there would be no burn.

On cross-examination Dr. McMann stated that at birth the baby had a blue tinge, and very likely it was given oxygen, and this baby could have been put in a resuscitator bassinet for that purpose. This is a sort of basket with a metal grill on the bottom which is covered with blankets, and beneath the grill, two or three inches from it, are four or six electric light bulbs operated by a switch on each side. Its purpose is to provide a warm place for the baby. Dr. McMann was in the delivery room until Mrs. Thompson was moved to her room, which was not more than half an hour from the time of delivery, and it was possible, he said, for the baby to have been in the bassinet for that period, and then taken out immediately by the nurse to the nursery without any order from him. He did not think it was reasonably possible that the blister could have been caused several hours before he examined it in the nursery next morning, and he did not see how it was possible for the burn to have been received in the resuscitator bassinet; that it did not seem reasonable that a burn from the bassinet would be limited to just one spot; that all the time it had been used he had never heard of a baby being burned; and that "with at least four people in that small delivery room, with a baby, that we thought necessary to look after enough to put it there, I don't think it could possibly be put on that iron grill without us knowing something about it; and I also think if it was blistered, we would see it—not the next morning."

The mother was not told about the burn until a week later, just before she went home on March 24. The superintendent of the hospital, Mrs. Stein, then told her that she did not know how it happened, whether it came from hot water bottles or not, but that it happened in the nursery on the morning after the child was born.

Defendant's evidence about the accident was furnished by Mrs. Stein, Superintendent, and Miss Crow, a nurse employed by it at the time of the accident.

Mrs. Stein said she was notified of the accident by a nurse

—she did not know which one—late in the morning after the baby was born; that she made an investigation but never did find out how the child was burned; that she remembered three nurses that were on night duty then, but did not remember which one was in charge of the delivery room; that in the usual routine, if it is cold, you always put hot water bottles around a new-born baby, but if the weather is unusually warm and the baby's body is warm, you don't always put hot water bottles around it. When it is done, usually there is a cover around the hot water bottle, and it is placed under the blanket; but if the water is too hot, or they failed to put the blanket between the hot water bottle and the baby, it could burn. With regard to the resuscitator bassinet, they always put a blanket over the grill, and you put the baby on the blanket, not on the grill. She questioned the nurses and they said they did not know how the accident happened; any one of the three could have put the hot water bottle with the baby, but she did not know which one took charge of the baby and they did not admit to her which one did.

Miss Crow testified that she was a graduate nurse, and was on general duty that evening as a relief nurse from floor to floor on the night the baby was born; that she took the child out of the bassinet in the delivery room into the nursery; that the only thing she noticed was that the blanket the baby was wrapped in was warm, and the baby was "red as it could be," but she did not see a blister. She bathed and oiled it, put it in the nursery bassinet and put a hot water bottle under its feet; that she first tested the bottle in the usual way and it did not seem hot; that the baby was then wrapped in the blanket and the hot water bottle was put under the blanket; that there was no indication of a burn at that time. After she tucked the baby away she left the floor and went off duty and did not find out the baby was burned until next afternoon when she came back on duty. She did not call anybody's attention to the heat of the blanket when she took the baby out of the de-

livery room—the baby was just red and she did not think enough about it to call it to the attention of Dr. McMann or any of the other nurses.

The clear effect of this evidence is to establish that the child was burned between the time it was taken from the delivery room and the discovery of the burn next morning in the nursery. In all of that period the baby was in the sole possession of the defendant's employees and the methods and instruments used in its care were within their exclusive control. It was their duty to exercise reasonable care for its safety and well-being. The defendant presented no evidence to show that it exercised any care at all in handling the baby after Miss Crow left. It offered no explanation of how the burn occurred. Its only answer by its evidence was that it did not know how it happened. In that state of the case, it was not error to tell the jury, as was done by instruction B½, that they might infer that the injury was due to some negligence of the defendant.

A private hospital, conducted for profit, owes to its patients such reasonable care and attention for their safety as their mental and physical condition, if known, may require. The care to be exercised should be commensurate with the known inability of the patient to take care of himself.[1]

In a proper case, a plaintiff may be aided in establishing a breach of such duty by a legal inference of negligence from proved facts. He may show a situation to which the *res ipsa loquitur* doctrine applies. Generally speaking, that doctrine applies in negligence cases where the instrumentality which caused an injury is within the exclusive possession and control of the person charged with negligence, and such person has, or should have, exclusive

---

[1] *Jefferson Hospital* v. *Van Lear*, 186 Va. 74, 41 S. E. (2d) 441; *Stuart Circle Hospital Corp.* v. *Curry*, 173 Va. 136, 3 S. E. (2d) 153, 124 A. L. R. 176; *Tucker Sanatorium* v. *Cohen*, 129 Va. 576, 106 S. E. 355, 22 A. L. R. 315; *Hogan* v. *Hospital Co.*, 63 W. Va. 84, 59 S. E. 943; *Fowler* v. *Norways Sanitorium*, 112 Ind. App. 347, 42 N. E. (2d) 415; *Tulsa Hospital Ass'n* v. *Juby*, 73 Okla. 243, 175 P. 519, 22 A. L. R. 333, and note p. 341.

knowledge of the way that instrumentality was used, and the injury would not ordinarily have occurred if it had been properly used. *George Foltis, Inc.* v. *New York*, 287 N. Y. 108, 38 N. E. (2d) 455.

"In *Scott* v. *London St. K. Docks Co.*, 3 H. & C. 596, Erle, C. J., observed that in order for it to apply 'there must be reasonable evidence of negligence, but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.'". *Riggsby* v. *Tritton*, 143 Va. 903, 907-8, 129 S. E. 493, 45 A. L. R. 280.

We have held that the doctrine was not to be applied in certain malpractice cases against physicians and dentists, primarily because as a matter of common experience and knowledge a bad result affords no presumption of negligence. The physician or dentist does not warrant a cure, and an unfavorable result may be, and often is, attributable to one or more factors for which he is not responsible, and may happen notwithstanding the exercise of a very high degree of care and skill.[2]

On the other hand, it has been frequently held by this court in cases of injury to railroad passengers by derailment that the *res ipsa loquitur* doctrine applied, generally on the ground that the carrier had immediate control of and sole responsibility for all of the instrumentalities of the carriage, and derailments do not ordinarily occur unless there is negligence on the part of the carrier.

Thus, in *Hines* v. *Beard*, 130 Va. 286, 107 S. E. 717, it was said: "In derailment cases a passenger is not expected to know nor required to prove the particulars of the negligence of the defendant resulting in the derailment, but as

[2] *Fox* v. *Mason*, 139 Va. 667, 124 S. E. 405; *Hunter* v. *Burroughs*, 123 Va. 113, 96 S. E. 360; *Henley* v. *Mason*, 154 Va. 381, 153 S. E. 653; *United Dentists* v. *Bryan*, 158 Va. 880, 164 S. E. 554; *Alexander* v. *Hill*, 174 Va. 248, 6 S. E. (2d) 661; *Reed* v. *Church*, 175 Va. 284, 8 S. E. (2d) 285.

derailments as a rule do not occur unless there is negligence on the part of the defendant, who has the immediate control of and is solely responsible for all of the instrumentalities of the carriage, there comes to the aid of the passenger, upon proof of the derailment and consequent injury, an inference, deduction or conclusion, sometimes called a presumption of fact or simply a presumption, of negligence on the part of the defendant, entitling the plaintiff to a verdict if there is no other evidence in the case, or which is to be weighed and considered by the jury with other evidence in the case, if there is such, in determining whether or not the defendant has been negligent." (130 Va. 290).[3]

"The doctrine of *res ipsa loquitur* is an evidential presumption, not to be invoked to overcome evidence, but to be applied in its absence." *Chesapeake, etc., R. Co.* v. *Tanner, supra; Norfolk Coca-Cola Bottling Works* v. *Krausse,* 162 Va. 107, 173 S. E. 497. "It applies where the injured person is powerless to ascertain the cause." *Richmond* v. *Hood Rubber Products Co.,* 168 Va. 11, 190 S. E. 95.

The application of the doctrine does not relieve the plaintiff of the burden of proof to establish the defendant's negligence. *Virginia Elec., etc., Co.* v. *Lowry, supra.* In *Hines* v. *Beard, supra,* is this statement from the oft-quoted case of *Sweeney* v. *Erving,* 228 U. S. 233, 33 S. Ct. 416, 57 L. Ed. 815, Ann. Cas. 1914D, 905: " 'In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict.

---

[3] See also, *Norfolk-Southern R. Co.* v. *Tomlinson,* 116 Va. 153, 81 S. E. 89; *Virginia Elec., etc., Co.* v. *Lowry,* 166 Va. 207, 184 S. E. 177; *Chesapeake, etc., R. Co.* v. *Tanner,* 165 Va. 406, 182 S. E. 239; *Chesapeake, etc, R. Co.* v. *Baker,* 150 Va. 647, 143 S. E. 299.

*Res ipsa loquitur* where it applies does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff. * * *.' " (130 Va. 293-94).

■ There is no good reason why the application of the rule should be limited to cases involving a particular activity. It should apply wherever the essential reasons for its being exist. As said in *George Foltis, Inc.* v. *New York, supra,* " 'the doctrine of *res ipsa loquitur* is not an arbitrary rule. It is rather a common-sense appraisal of the probative value of circumstantial evidence. It requires evidence which shows at least probability that a particular accident could not have occurred without legal wrong by the defendant. To negative every possibility that the accident occurred in some extraordinary manner which would exculpate the defendant is often impossible. In the administration of the law we must be satisfied with proof which leads to a conclusion with probable certainty where absolute logical certainty is impossible. * * *.' " (38 N. E. (2d) 459-60).

■ Instruction B½ properly states the application and the limitation of the rule as applied to the evidence in this case. On the evidence adduced, the accident would not have happened but for the negligence of the defendant's employees. It resulted from the use of instrumentalities under the control of the defendant and to a helpless patient also in the possession and under the exclusive control of the defendant. The plaintiff was powerless to ascertain why and how it happened. If it happened without the negligence of anybody, contrary to ordinary experience, the defendant could have presented evidence so to indicate or establish. None was produced, and it was proper to tell the jury that an inference existed in favor of the plaintiff in the absence of any explanation from the defendant.

In *Meyer* v. *McNutt Hospital,,* 173 Cal. 156, 159 P. 436, the patient alleged that she was burned on the legs by a hot water bottle while she was unconscious from an anaesthetic.

There was no direct testimony that any servant of the hospital had applied hot water bottles to cause the injuries, but the court said:

"The doctrine *res ipsa loquitur* is properly applied to the facts of this case. The patient was unconscious. Under its contract with her the defendant corporation owed her a duty of protection which was violated by the use of an instrumentality which produced the painful results which were made manifest when she came out from the influence of the anaesthetic. Proof of the accident carried with it the presumption of negligence." (p. 437).

See also, *Timbrell* v. *Suburban Hospital*, 4 Cal. (2d) 68, 47 P. (2d) 737 (hot compresses and hot water bottles applied to unconscious patient); *Quillen* v. *Skaggs*, 233 Ky. 171, 25 S. W. (2d) 33 (burn from hot water bottle while plaintiff was under anaesthetic); *Richardson* v. *Dumas*, 106 Miss. 664, 64 So. 459 (mentally ill patient allowed to fall from window); *Adams* v. *University Hospital*, 122 Mo. App. 675, 99 S. W. 453 (patient burned by hot water bottle while under anaesthetic—decision against plaintiff because defendant a charitable institution).

In *Ybarra* v. *Spangard*, 25 Cal. (2d) 486, 154 P. (2d) 687, 162 A. L. R. 1258, the plaintiff received an injury caused by pressure or strain applied between his shoulder and neck while he was being operated on for appendicitis. He sued a number of the doctors and nurses involved. The court pointed out that the case presented no problem of negligence in treatment, but of distinct injury to a healthy part of the body not the subject of treatment, nor within the area covered by the operation. It was held that the *res ipsa loquitur* doctrine applied, in spite of the objection of the defendants that there was a division of responsibility in the use of the instrumentalities causing the injury. The court said:

"The control at one time or another, of one or more of the various agencies or instrumentalities which might have harmed the plaintiff was in the hands of every defendant

or of his employees or temporary servants. This, we think, places upon them the burden of initial explanation." (162 A. L. R. 1263.)

This case goes somewhat farther in its application of the doctrine than do our own, and we do not here approve it in its entirety, but these statements from the opinion are pertinent:

"Without the aid of the doctrine a patient who received permanent injuries of a serious character, obviously the result of some one's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability. * * * *

" * * * * Plaintiff was rendered unconscious for the purpose of undergoing surgical treatment by the defendants; it is manifestly unreasonable for them to insist that he identify any one of them as the person who did the alleged negligent act." (162 A. L. R. 1262-63), and see note to this case, p. 1267.

It is no valid objection to the application of the doctrine that by possibility the burn might have occurred in the resuscitator bassinet in the delivery room, for which Dr. McMann might have been responsible (*Arnold* v. *Wood*, 173 Va. 18, 3 S. E. (2d) 374). That is not the evidence. The plaintiff "is not required to exclude every possibility that the injury might have been caused through some means for which the defendant is not responsible." *United Dentists* v. *Bryan, supra.* "The test is whether the circumstances are such as would satisfy a reasonable and well-balanced mind that the accident resulted from the negligence of the defendant. The testimony need not exclude everything which the ingenuity of counsel may suggest as having possibly caused or contributed to the injury." *Rozumailski* v. *Philadelphia Coca-Cola Bottling Co.*, 296 Pa. 114, 145 A. 700, 701.

The instruction applied to the evidence as presented and it is not to be presumed that the jury applied it otherwise.

The plaintiff's case was based on what happened in the nursery where the baby and the instrumentalities were under the control of the defendant. In moving to strike out plaintiff's evidence, defendant's counsel said: "The only evidence dealing with a possible negligence of the Defendant is that the child was burned as a result of a hot water bottle, but that doesn't show negligence."

The instruction by its terms limited its application to "means or instrumentalities in the control of the defendant." In view of its language and of the evidence, there is no room for an objection that the jury might have applied it to a means or instrumentality in the control of somebody else.

Defendant says the verdict was excessive. The jury saw the child and examined its wound. There was evidence, which the jury could accept, that after the burn the child suffered, was restless and crying and could not sleep. It was taken back to the hospital for treatment. It did not respond to the treatment and about four weeks later it was returned to the hospital and operated on by a surgeon called by the hospital. She was in the hospital about a month after that. The operation was not successful and the scar remained. The place itched and the child scratched and rubbed it. She is still restless at night and her leg aches after she has played. It has affected her walking; she limps or hops "and her leg is kind of twisted in it." The parents waited more than four years before bringing suit because they were told that the burn would not do any harm and that the scar would be normal in time; but it has grown; there is a hard gristle under the skin, and the scar gets larger as the child gets larger, and the scar gets tighter over the gristle. The doctor who performed the first operation advised that another one be performed, but a child specialist to whom the child's parents took her advised against it.

The jury were clearly instructed on the proper elements of damage. They were warned against being influenced by sympathy or acting on conjecture. Their

verdict was large, but not so large as to warrant a conclusion by us that it was brought about by passion, prejudice or improper means, and not supported by the evidence. Unless we can say so, we ought not to reverse for that. A precise standard for measuring damages for injury and suffering has not been found. The opinion of a jury, acting on credible evidence and under proper instructions, usually furnishes a reasonable standard, and should not be supplanted by a different opinion without a clear showing that it has been formed by improper factors. *Stuart Circle Hospital Corp.* v. *Curry, supra; E. I. Du Pont De Nemours & Co.* v. *Taylor,* 124 Va. 750, 98 S. E. 866; *National Fruit Product Co.* v. *Wagner,* 185 Va. 38, 37 S. E. (2d) 757.

There is no reversible error and the judgment is

*Affirmed.*