Kenneth TRUEMAN, Administrator of the Estate of Karen Trueman, a Minor, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 8514.

United States District Court
E. D. Louisiana,
New Orleans Division.

Jan. 25, 1960.

ceiving an intravenous injection of 70 percent Urokon[1] solution in the dorsum of the right hand for diagnostic purposes, approximately 2 cubic centimeters of the dye infiltrated into the subcutaneous tissue, resulting in contraction of the extensor tendons of the second, third, fourth and fifth metacarpal phalangeal joints[2] of the hand. This suit is brought under the provisions of the Federal Tort Claims Act[3] in behalf of the estate of the minor, as well as the mother and father individually, charging negligence in the injection and subsequent treatment.

On November 29, 1956, the plaintiff, Kenneth Trueman, a sergeant in the United States Army stationed at Fort Eustis, Virginia, in an effort to ascertain the cause of persistent vaginitis, brought his daughter to the Army hospital at Fort Eustis for visualization of her kidneys. To visualize the kidneys, the Army medical officers at the hospital decided to use Urokon, an opaque dye indicated for that purpose. When injection in the upper arm failed, it was determined to use the dorsum of the right hand. As might be expected, the child was not cooperating at this stage, so one of the Army medical officers held the hand rigid while the other attempted the injection. In the process, some 2 ccs of the drug extravasated into the soft tissues of the hand, causing immediate burning and puffiness.

Gemeinhardt, Johannesen, Roberts & LaCour, Walter F. Gemeinhardt, Sternfels & Raphael, Roland J. Sternfels, New Orleans, for plaintiff.

Lloyd C. Melancon, New Orleans, Asst. U. S. Atty., for defendant.

J. SKELLY WRIGHT, District Judge.

Little Karen Trueman, age 6, was a patient at the United States Army Hospital, Fort Eustis, Virginia. While re-

Instead of diluting and dispersing the Urokon from the soft tissues of the hand through the use of hyaluronidase[4] or some other dispersal agent, the medical officers at the hospital decided to treat the extravasation conservatively with hot compresses and elevation of the hand. The child was allowed to return to her home, but by the same evening she was back again at the hospital with blister-

---

1. Urokon is 65.8% iodine.

2. These are the knuckle joints.

3. 28 U.S.C. §§ 1346(b), 2674.

4. The literature on Urokon, published by its manufacturer, reads:

"In intravascular processes, extravasation produces a stinging pain which is usually of short duration. When large spills occur, prolonged soreness or possible fibrosis may be reduced or prevented by injection of hyaluronidase into the extravasated area. * * *"

ing [5] over the area and increased pain. Further conservative treatment was indulged and again the child was allowed to return to her home.

She was seen at the hospital the following day, and again on December 7, 1956, at which time the hospital record shows that she was doing well and that she should return in one week. Karen did not return as directed. On December 29, 1956, because of a death in the family, Sergeant and Mrs. Trueman took Karen to Massachusetts for the funeral. There the mother noticed that the child was unable to close her hand. The Truemans cut short their trip East and returned the child to the Fort Eustis hospital, where physiotherapy was at first prescribed. On February 1, 1957, and again on February 6th, the child underwent manipulation of the knuckle joints under anesthesia. She was placed in an elastic traction splint and physiotherapy continued.

When the hand failed to improve, the medical authorities at Fort Eustis had the child seen by an orthopedic consultant at the Walter Reed Army Hospital, Washington, D. C. There her condition was again diagnosed as contraction of the extensor tendons of the right hand, the remaining joints of the fingers maintaining their normal range of motion. She was given a prescription for a knuckle-bending splint designed to restore flexion in the knuckle joints and was told to wear the splint 24 hours a day.

In April, 1957, Sergeant Trueman was sent overseas and Mrs. Trueman, with her child Karen, returned to her home in New Orleans. She was instructed by the doctors at Fort Eustis to report with the child to the Leroy Johnson Army Hospital in New Orleans for continued treatment of Karen's hand. This she did, without benefit to the child. Finally, the child's hand became fixed at a 180° angle. She could not bend her fingers at the knuckles. The mother thereupon sought civilian medical assistance.

On July 9, 1957, capsulotomies were performed upon the second, third, fourth and fifth metacarpal phalangeal joints of the right hand by Dr. George C. Battalora, an outstanding orthopedic surgeon in New Orleans. As a result of this operation and subsequent treatment, the condition of the hand has improved so that now there is 85 percent flexion in the right forefinger, 80 percent in the third and fourth, and 65 percent in the fifth. The doctor's estimate of Karen's present disability is 25 percent of the right hand, or 12 to 15 percent of the whole body. This will be permanent, although it is possible that a second similar operation would decrease to some extent the limitation in the knuckle joints. The medical experts are unable to say whether the child's hand will grow normally. At the present time, however, the right hand seems to be slightly smaller than the left.

 It is agreed that the law of Virginia must be applied to the facts of this case in resolving the question of liability.[6] In that state there are no statutory provisions pertaining to malpractice as such, and, in determining responsibility for personal injuries generally, Virginia follows the common law of England prior to 1607, except where changed by subsequent state statute or decision. The result is that the law of Virginia does not differ from the law in other states with reference to malpractice. Physicians and surgeons there, as elsewhere, are required to exercise the degree of care ordinarily exercised by similar practitioners under similar circumstances and conditions.[7]

5. The government contends that this blistering resulted from too hot compresses applied by the parents rather than from the Urokon.

6. See 28 U.S.C. § 2674.

7. Reed v. Church, 175 Va. 284, 8 S.E.2d 285; Alexander v. Hill, 174 Va. 248, 6 S.E.2d 661; United Dentists v. Bryan, 158 Va. 880, 164 S.E. 554; Ropp v. Stevens, 155 Va. 304, 154 S.E. 553; Henley v. Mason, 154 Va. 381, 153 S.E. 653; Fox v. Mason, 139 Va. 667, 124 S.E. 405.

Applying this test, the Army medical officers who participated in the injection of Urokon in the dorsum of the right hand of Karen Trueman, and in her subsequent treatment, must be held not to have exercised the required degree of care. The government suggests that the extravasation of 2 ccs of Urokon is a common experience and indicates no lack of care. It further maintains that in such circumstances conservative treatment is all that is required to disperse the dye from the affected part of the body.

The evidence does not support the government's contentions or its assertion of due care in behalf of its doctors. In the first place, instead of using the mildest Urokon solution available for this six-year-old child, the doctors at Fort Eustis used the 70 percent concentration which, in the literature of the manufacturer, "is not recommended for routine use in intravenous urography. This concentration should be reserved for difficult cases which do not show adequate shadow density when one of the less concentrated solutions of Urokon Sodium is employed." No explanation is offered for this failure to follow the manufacturer's directions. This was the first mistake made by the Army medical officers.

The second was in allowing the Urokon to extravasate to the extent it did. The government's own expert testified that Urokon should be injected slowly, and that if a doctor is careful, he will realize even when one-half cc is extravasated. Here, admittedly, at least 2 ccs infiltrated the soft tissues of Karen Trueman's hand before the doctors knew the injection was not being made into the vein. The government's suggestion is that Karen moved her hand, causing the needle to leave the vein. There was one Army doctor participating in the injection whose sole duty was to restrain that movement. If the hand did move, his failure to restrain it is not explained.

Thirdly, and probably most importantly, after these doctors knew that the Urokon had infiltrated the soft tissues of the child's hand, they again failed to comply with the directions of the manufacturer of the drug. They failed to dilute and disperse the Urokon by injection of hyaluronidase into the extravasated area.[8] It is true that Karen, in all probability, was difficult to inject. But that difficulty did not excuse the failure to take the recommended action to disperse the drug, knowing, as these doctors should have known, that it would, and as it did in this case, cause fibrosis of the tissues.

The government's expert testimony is particularly unconvincing. One of the two experts presented testified that he would never use hyaluronidase or any other dispersing agent, irrespective of the amount of Urokon extravasated. Cross examination showed that this expert had never used Urokon either. He also disagreed with every other Army medical officer, as well as with plaintiff's medical experts, on the cause of the contracture of the extensor tendons in Karen's right hand. His diagnosis of the cause was failure to flex the knuckles over a long period of time, probably because of the blistering on the back of the hand. He denied the presence of fibrosis, or even tendonitis, as an inhibiting factor in the use of the hand. But the Army medical record throughout shows a diagnosis of fibrosis. And the Army doctor, Piccirillo, who performed the unfortunate injection diagnosed the resulting condition as tendonitis.

The other Army expert could not believe that 2 ccs of Urokon could cause the fibrosis, and the consequent contracture of the extensor tendons, in Karen's hand. Perhaps he is right.[9] It is entirely possible that considerably more than 2 ccs were extravasated. The 2 ccs is Dr. Piccirillo's estimate.

8. See Note 4.

9. Dr. John Menville, a respected urologist practicing in New Orleans, testified, however, that even where only a few drops of Urokon is spilled, a dispersal agent should be injected into the affected area.

In Virginia, absent proof of loss of services or expense incurred, the parents, as such, have no claim in damages for injury to their child.[10] Their claims, therefore, must be dismissed. The child's damages are fixed at $15,-000.[11]

Judgment accordingly.

---

10. Awtrey v. Norfolk & Western Ry. Co., 121 Va. 284, 93 S.E. 570, L.R.A.1918D, 279.

11. The following Virginia jurisprudence was considered in fixing the quantum: P. Lorillard Co. v. Clay, 127 Va. 734, 104 S.E. 384; Norfolk Ry. & Light Co. v. Spratley, 103 Va. 379, 49 S.E. 502; Richmond Passenger & Power Co. v. Robinson, 100 Va. 394, 41 S.E. 719.