# PARVIZ MODABER, M.D.

## V.

# JESSIE MARIE KELLEY

Record No. 830744

September 5, 1986

Present: All the Justices

*R. Harrison Pledger, Jr. (Joseph J. Perez*, on briefs), for appellant.

*John J. Buckley, Jr. (Billie Lee Dunford-Jackson; Williams and Connolly; Davies, Barrell, Will and Dunford-Jackson*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this damage suit arising from medical malpractice, we consider whether a mother has sustained personal injuries, as well as mental anguish, due to the stillbirth of her child and, if so, whether the amount of the damage award is excessive.

In November 1981, appellee Jessie Marie Kelley and Ronald H. Kelley, her husband, sued appellant Parviz Modaber, a medical doctor specializing in obstetrics, for damages arising from the November 1978 stillbirth of their child in the Culpeper Memorial Hospital. In October 1981, a Medical Malpractice Review Panel, convened according to law, had decided unanimously that Modaber had failed to comply with the appropriate standard of care in his treatment of the mother. In a multi-count motion for

judgment, the Kelleys sought compensatory and punitive damages on various theories.

As the result of pre-trial rulings by the court and the voluntary dismissal of certain counts of the motion for judgment, the case ultimately went to a jury on Mrs. Kelley's request for compensatory and punitive damages based on negligence. She alleged that Modaber failed to comply with the appropriate standard of care in his treatment of her during the pregnancy and at the time of the birth. She asserted that such failure caused injury to her and the death of the infant.

The jury found in favor of the plaintiff and awarded $750,000 compensatory damages. No punitive damages were assessed. Overruling defendant's motion to set aside, the trial court entered judgment on the verdict in February 1983. We awarded defendant an appeal limited to consideration of the foregoing questions. Defendant's negligence is not an issue on appeal.

We will summarize the facts in the light most favorable to the plaintiff, according to settled principles. In March 1978, the plaintiff, in her mid-thirties, and her husband conceived a male child. In May 1978, the plaintiff came under the care of Dr. John Payette and defendant, both Culpeper physicians, for the purpose of receiving obstetrical and surgical care during her pregnancy and for the care and delivery of the child. Modaber saw the plaintiff for the first time the following August. At the time, Modaber knew that plaintiff had undergone three successful pregnancies and that she had given birth to three daughters prior to March 1978. He also knew that the mother had suffered in those pregnancies from a form of pregnancy-induced hypertension known as toxemia, or preeclampsia. According to the evidence, toxemia is a condition which threatens the mother's life and the fetus during pregnancy. Modaber also knew that plaintiff had a history of premature deliveries and rapid labors. He also was aware that, during another pregnancy, plaintiff had an abortion upon advice of her physician because she suffered from severe toxemia.

On November 9, defendant examined plaintiff in his office. He determined that plaintiff had developed and was suffering from toxemia. The defendant subsequently examined plaintiff in his office on November 14 and 21. Each time, the toxemia had worsened and the threat to the mother and unborn child had increased. The plaintiff's expert witnesses testified that the plaintiff should

have been hospitalized as early as November 9 in order to treat the condition. At no time did defendant recommend hospitalization.

On November 27, at 5:10 a.m., plaintiff went into active labor at her home near Culpeper. The labor was several weeks premature. She immediately was transported to Culpeper Memorial Hospital by her husband. Upon admission to the hospital at 5:45 a.m., the plaintiff's blood pressure was extremely elevated and her condition was "serious." She was on the verge of convulsions, the first of which would have killed the infant and the second "may" have killed the mother. She was "an ongoing medical emergency of the first degree and require[d] immediate treatment." At the time, no physicians were on duty at the hospital.

At 5:50 a.m., a nurse at the hospital called defendant at home by telephone and reported the plaintiff's condition. Modaber, who had been asleep, did not leave his home and come to the hospital. Instead, he gave the nurse certain orders and, according to Modaber, sat in his bed to give the plaintiff a chance to "respond" to the orders he had given the nurse. Contrary to the standard of care, Modaber also did not order the hospital staff to be prepared for the possibility of a cesarean section or other surgery upon the mother.

At approximately 6:40 a.m., a fetal monitor was started by a nurse to record the fetal heart rate and the contractions of the mother's uterus. The electronic tracings revealed the steadily worsening condition of the fetus from that time until the monitor was stopped a few minutes before the birth. At 6:55 a.m., a nurse called defendant again at home by telephone. According to the nurse, "He sounded like he had been asleep." The nurse summarized "what was happening." Modaber told her to check the fetal heart rate again and to "call him back." Defendant still did not order that the hospital operating room personnel be alerted for possible surgery.

The nurse was unable to discern any fetal heart rate on the monitor and, at 7:10 a.m., called Modaber again at home. Modaber asked the nurse "to put the phone up to the monitor." After Modaber listened to the monitor, he said, "I'll be right there." Modaber arrived at the hospital about 7:20 a.m.

When Modaber reached the labor room, where the plaintiff had been since admission to the hospital, he placed an electrode on the head of the fetus for additional monitoring. He then explained to

the mother that emergency surgery was necessary to save the infant. In addition, defendant asked a nurse to have the plaintiff sign a paper consenting to elective sterilization surgery to be performed at the time of the emergency surgery. The nurse testified she considered the request "preposterous" because of the existing state of emergency in which "[w]e had a baby dying." Then, Modaber left the labor room, indicating to the nurse that he was leaving to go to his office some distance away "and get the papers."

The nurses then prepared the plaintiff for surgery and moved her in her bed from the labor room toward the operating room. Before the plaintiff reached the operating room, the infant was born spontaneously at 7:43 a.m. At the moment of birth, plaintiff was not attended by a physician, although defendant arrived moments later. Efforts to resuscitate the infant were unsuccessful. Expert opinion indicated that the infant died some time after the fetal monitor was stopped and before delivery.

Although defendant was of opinion that the infant died because of a prolapsed umbilical cord, plaintiff's experts testified that premature separation of the placenta from the uterine wall caused the death. According to plaintiff's experts, the elevated blood pressure of the mother caused by the toxemia resulted in the vessels in the placenta becoming brittle, thus depriving the fetus of adequate oxygen. An accurate determination of the cause of death was hampered, according to the evidence, because, contrary to standard practice, defendant did not order pathological examination of the placenta and the remains of the fetus.

A physician testifying for the plaintiff called defendant's failure to come immediately to the hospital, after being first called at 5:50 a.m., "reckless and bizarre and callous, and strange." Another plaintiff's physician testified that defendant's failure to comply with the applicable standard of care meant that the infant was allowed to die. The witness stated that defendant could have delivered a live baby had he performed emergency surgery at any time before the fetal monitor was disconnected.

The case was submitted to the jury on the theory that the plaintiff had suffered two distinct types of direct physical injuries. On the one hand, she had incurred injuries resulting from defendant's failure to properly treat and manage the toxemia during her pregnancy and before the events of November 27. On the other hand, the plaintiff had suffered physical injury in the form of injury to

her unborn child and its eventual stillbirth. This injury resulted from plaintiff's improperly managed and worsening toxemic condition as well as from defendant's failure to properly treat plaintiff and the fetus on the morning of November 27. As a result of defendant's acts of omission, fetal death occurred while the infant was joined to and a part of his mother.

The first issue on appeal stems from the trial court's action in instructing the jury on the mother's right to recover compensatory damages in this case. The court instructed the jury that "injury to an unborn child in the womb of the mother is to be considered as physical injury to the mother." The court further told the jury that in assessing the damages to which the mother may be entitled, the jury could consider:

"Any bodily injuries sustained and the extent and duration thereof including injury to the child in her womb;

"Any physical pain, emotional distress, and mental anguish suffered by her in the past, and any which may be reasonably expected to be suffered by her in the future including emotional distress and mental anguish resulting from the death of the child in her womb; . . ."

Defendant argues that the trial court erred by instructing the jury that the prenatal death of a fetus constitutes a direct physical injury to the mother. He contends "there was no evidence of an actual physical injury to Mrs. Kelley." Defendant argues that plaintiff had a potential, but unproved, cause of action for emotional distress if she qualified under the rules of *Hughes* v. *Moore*, 214 Va. 27, 197 S.E.2d 214 (1973) (recovery allowed for emotional disturbance and resulting physical injury, notwithstanding lack of physical impact, when proof is clear and convincing that physical injury was natural result of fright or shock proximately caused by defendant's negligence) or *Womack* v. *Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974) (recovery allowed for emotional distress, unaccompanied by physical injury, provided certain elements are shown). Additionally, defendant points out, there is no right of action under the Virginia Death By Wrongful Act Statute, Code § 8.01-50 to -56, for the death of a stillborn child. *Lawrence* v. *Craven Tire Co.*, 210 Va. 138, 169 S.E.2d 440 (1969). In essence, defendant argues, the plaintiff has been improperly al-

lowed to circumvent *Lawrence* and to recover for the death of her child as if it were an injury to her person. We do not agree.

The defendant has disregarded entirely the abundant evidence supporting the first type of direct physical injury suffered by the plaintiff. Defendant's failure to properly treat and manage plaintiff's toxemia during her pregnancy from the time it was discovered on November 9 resulted in specific injuries to her. Even though the evidence showed that Modaber's conduct did not cause the condition, which is a complication of pregnancy, nevertheless, defendant's inaction aggravated the effects of the condition upon her. For example, the evidence showed that progression of the disease could have been prevented had Modaber exercised the requisite care by hospitalizing the plaintiff in November. Adequate treatment could have prevented: her blood pressure from becoming elevated to alarming degrees; further swelling (edema) of the hands, feet, and face caused by accumulation of excess water; and increased protein in the urine as well as reduced kidney performance. One physician testified that plaintiff's toxemia "was neglected badly." In sum, the evidence fully supported a finding that Modaber's conduct during the pregnancy caused direct injury to the plaintiff. Indeed, she was on the verge of convulsions and death at the time of her admission to the hospital.

Turning to the second type of injury claimed — the element of the case challenged by defendant — we are of opinion that the trial court properly ruled the plaintiff had sustained a direct injury due to injury to the fetus and its eventual stillbirth. In Virginia, the law is established that an unborn child is not a "person" within the meaning of our wrongful death statute, *Lawrence* v. *Craven Tire Co.*, 210 Va. at 140-42, 169 S.E.2d at 441-42. For a review of the conflicting results reached by the courts which have decided whether a wrongful death action lies for the death of an unborn child, see Annot., 84 A.L.R.3d 411.

Furthermore, we have adopted the view in tort litigation that an unborn child is a part of the mother until birth. *Lawrence*, 210 Va. at 142, 169 S.E.2d at 442. Accordingly, we hold that injury to an unborn child constitutes injury to the mother and that she may recover for such physical injury and mental suffering associated with a stillbirth. She is not entitled, however, to damages ordinarily recoverable in a wrongful death action. For example, the mother may not recover for anticipated loss of the child's society, companionship, comfort, or guidance. She may not be com-

pensated for an expected loss of income of the child or for services, protection, care, or assistance expected to be provided by the child had he lived. *See* Code § 8.01-52.

This rule is followed in other jurisdictions. For example, in *Graf v. Taggert*, 43 N.J. 303, 204 A.2d 140 (1964), the Supreme Court of New Jersey, while deciding there was no right of recovery for a stillborn under the wrongful death act, said that "the wrong suffered does not go completely unrecompensed" because, if the defendants were negligent, the mother "can recover for the injuries she sustained, both physical and mental, including the emotional upset attending the stillbirth." 43 N.J. at 312-13, 204 A.2d at 146. In *Snow* v. *Allen*, 227 Ala. 615, 151 So. 468 (1933), a mother sued a physician for malpractice which caused the stillbirth of her child. The Supreme Court of Alabama, finding in favor of the mother, pointed out that recovery in that case was not "on account of the death of the child, but for the pain and anguish suffered by the mother on account of its death, occasioned by the negligence of the defendant." *Id.* at 618-19, 151 So. at 471. The court also said: "So long as the child is within the mother's womb, it is a part of the mother, and for any injury to it, while yet unborn, damages would be recoverable by the mother in a proper case." *Id.* at 619, 151 So. at 471. The court stated:

> "If the mother was caused to suffer physical pain by reason of the killing of the unborn child, occasioned by the negligence of defendant, no one, we assume, would argue that she could not recover in this action for such pain; and, likewise, if on account of the negligent destruction of the child, in its delivery, the mother also suffered distress of mind, a recovery could be had for such mental anguish."
> *Id.*

■ Consequently, we conclude that the trial court did not err by instructing the jury that "injury to an unborn child in the womb of the mother is to be considered as physical injury to the mother" and by permitting the jury to assess damages for the injuries and mental anguish suffered by her as the result of the fetal death occurring while the infant was a part of her. *See Miller* v. *Johnson*, 231 Va. 177, 184, 343 S.E.2d 301, 305 (1986).\*

---

\* On appeal, for the first time, defendant adds a new twist to his attack on the foregoing substantive ruling by the trial court. He now challenges the form of the instruction in question. He contends that the language permitting recovery for bodily injuries, "including

The second issue on appeal deals with the size of the damage award. Noting that the amount of the verdict was the maximum then allowed by statute in cases of this type (the statutory malpractice limit now is one million dollars, Code § 8.01-581.15), defendant contends that the size of the award is so excessive as to shock the conscience of the court. Repeating an earlier argument, defendant contends "there was no evidence that Mrs. Kelley suffered any physical injury (except for the trial court's instruction that the still birth was a direct physical injury to her), physical pain, emotional distress or mental anguish except for Mrs. Kelley's statement that, 'I guess a day don't go by that we don't some way or another remember it.' " Defendant points out there was no evidence of medical bills upon which her claim for damages could be based nor was there evidence that plaintiff required or even sought medical or psychiatric treatment after she was discharged from the hospital three days after the birth. Indeed, defendant notes, plaintiff has since given birth to twin girls. Defendant contends the plaintiff had a natural childbirth resulting from a normal labor with no physical injury to the mother in addition to the childbirth.

Summarizing, defendant says that in view of the excessive amount awarded, "it seems clear that the jury compensated Mrs. Kelley not for her own physical or emotional injuries, but for the death of the child." He maintains that the "amount of the verdict proves that it was either the result of the jurors' passion, corrup-

---

injury to the child in her womb," and for emotional distress, "resulting from the death of the child in her womb," amounted to an improper invitation to the jury to assess damages for the value of the child's life. In other words, defendant now argues that the instruction erroneously did not limit the jury to an award only for the injury and anguish suffered by the mother on account of the fetal death.

This contention comes too late. Rule 5:25 (formerly Rule 5:21). We have searched the record, both the printed appendix and the manuscript record, to determine whether defendant made this specific objection to the trial court. Nowhere does the record reveal such an objection. See discussion of the instruction in question at appendix pp. 836-38 and transcript pp. 1031, 1062. Indeed, counsel for defendant failed to object during closing argument when counsel for the plaintiff seemed improperly to ask damages for the child's life (e.g., "Now ladies and gentlemen of the jury your verdict should express the fact that you unlike some others, value the life of the unborn, value the child's life, the baby in the mother's womb and it should reflect if you think it is not cheap. . . ."). Even though the trial judge mentioned this general issue while rendering his oral opinion overruling the motion to set aside the verdict, see appendix 892-95, defendant never raised the specific issue in the trial court with reasonable certainty. We will not entertain such issue for the first time on appeal.

tion, or prejudice, or a misconception or misunderstanding of the facts or the law, or that it was not the product of fair and impartial deliberations."

Although the amount of the verdict is larger than some members of this Court would have awarded had we been sitting as jurors in this case, we cannot say that it is excessive as a matter of law. The rules of appellate review under these circumstances are clearly established. "Ordinarily, damage awards fixed by a jury following a properly conducted trial and approved by the trial judge are held to be inviolate against disturbance by the courts." *The Gazette* v. *Harris*, 229 Va. 1, 48, 325 S.E.2d 713, 744 (1985) (internal quotation marks omitted). "A precise standard for measuring damages for injury and suffering has not been found. The opinion of a jury, acting on credible evidence and under proper instructions, usually furnishes a reasonable standard, and should not be supplanted by a different opinion without a clear showing that it has been formed by improper factors." *Danville Community Hospital* v. *Thompson*, 186 Va. 746, 764, 43 S.E.2d 882, 890 (1947); *Stuart Circle Hospital* v. *Curry*, 173 Va. 136, 152, 3 S.E.2d 153, 159 (1939).

The question whether a verdict is excessive is initially addressed to the sound discretion of the trial judge who has observed the incidents of trial, which cannot be reproduced in the cold, printed pages of the appellate record. *American Oil Co.* v. *Nicholas*, 156 Va. 1, 12, 157 S.E. 754, 758 (1931). But the appellate court is charged with the duty of declaring a verdict excessive and ruling that the trial judge has abused his discretion whenever the size of the award shocks the conscience of the Court and creates the impression that the jury was biased in favor of the plaintiff or prejudiced against the defendant or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the plaintiff's injuries as to suggest that it is not the product of a fair and impartial decision. *Edmiston* v. *Kupsenel*, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964). We find no abuse of discretion in this case.

There is abundant evidence of physical injury and mental suffering to support this verdict. We have already discussed most of it. The plaintiff was pregnant with the male child which, the evidence shows, she and her husband had eagerly anticipated. During the pregnancy, the toxemia was permitted to worsen to an extreme degree. The lack of proper medical care caused elevation

of her blood pressure, increased edema and discomfort throughout her body, and kidney problems. She was in such poor condition from the defendant's neglect that she was on the verge of death when admitted to the hospital. According to the evidence, her labor while in the hospital was "tumultuous" because of the untreated toxemia.

Her emotional distress and mental anguish was pronounced. Having observed the plaintiff on the witness stand, the trial court commented on the record about what he saw. He stated: "Her emotional distress can be said to have been manifest not only by her words but by her appearance and her conduct during her testimony. That is something the jury can see and does not necessarily appear on the record." The court also noted that the death of the fetus constituted "an emotional impact" on the plaintiff and that this furnished "proof which the jury could rely upon by the appearance and demeanor of the mother on the stand as she testified recalling the event." In the course of stating his reasons for overruling the motion to set aside the verdict, the trial judge, in noting that the size of the verdict did not shock his conscience, said, "the jury had Mrs. Kelley to observe."

The jury could also have concluded from the proof that the plaintiff suffered mental anguish in many ways. For example, she was permitted to lie conscious in a hospital for nearly two hours knowing that the heartbeat of her unborn child was diminishing steadily. She is bound to have been aware that her unborn child was in danger of dying and, yet, her physician, who lived minutes from the hospital, failed to appear to care for her and the fetus. She must have realized that her own condition was grave. She was forced to deliver, spontaneously and unattended, a dead child. At the trial, held almost four years after the stillbirth, the plaintiff testified that the traumatic experience was still a recurring and daily memory. Under these circumstances, we cannot say that the amount of the verdict shocks our conscience or creates the impression that the jury acted from improper or illegal motives. Indeed, the jury has demonstrated, by refusing to award punitive damages, that it did not intend to punish Modaber, only to compensate the plaintiff.

For these reasons, the judgment in favor of the plaintiff will be

*Affirmed.*