**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RUTH S. DANIEL,
<u>Plaintiff-Appellee,</u>

v.

DAVID C. PEARCE, M.D.,

<u>Defendant-Appellant,</u>

and

No. 99-1405

ROGER W. JONES, M.D.; DANIEL G.
JENKINS, M.D.; WILLIAMSBURG
OBSTETRICS AND GYNECOLOGY, P.C.,
a Virginia Corporation,
<u>Defendants.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
James E. Bradberry, Magistrate Judge.
(CA-96-24-4)

Argued: April 7, 2000

Decided: April 28, 2000

Before WILLIAMS, MICHAEL, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Carolyn Porter Oast, HEILIG, MCKENRY, FRAIM &
LOLLAR, Norfolk, Virginia, for Appellant. Henry London Anderson,

Jr., ANDERSON, DANIEL & COXE, Wrightsville Beach, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Ruth Daniel brought suit for professional malpractice in the Eastern District of Virginia against her obstetrician, David Pearce, M.D., and his associates, Roger Jones, M.D., and Daniel Jenkins, M.D., and their professional group practice corporate entity, Williamsburg Obstetrics & Gynecology, P.C. ("Williamsburg Obstetrics"). In her lawsuit, Ms. Daniel alleged medical malpractice by her doctors' failure to diagnose and appropriately treat her preterm labor while she was pregnant with twins. At the conclusion of the trial on October 5, 1998, the jury returned a verdict for the plaintiff and against Dr. Pearce for $2 million. The district court[1] reduced the jury's verdict to $1 million, pursuant to the Virginia statutory maximum.[2] See Va. Code Ann. § 8.01-581.15 (limiting medical malpractice recovery to one million dollars). Dr. Pearce appeals the district court's denial of his post-trial motion for judgment as a matter of law, or in the alternative for a new trial. Finding no reversible error, we affirm.

I.

In 1994, Ms. Daniel and her husband decided they were ready to

_____

[1] By consent, this suit was tried by the United States Magistrate Judge in Newport News. See 28 U.S.C. § 636(c)(1).

[2] After presentation of the evidence, the district court granted judgment as a matter of law in favor of both Dr. Jones and Williamsburg Obstetrics. The jury found Dr. Jenkins was not liable. The disposition of the case with respect to these parties is not at issue in this appeal.

2

have children. Ms. Daniel, a school teacher, was a patient of Williamsburg Obstetrics, and Dr. Pearce was her primary physician. In September 1994, Ms. Daniel became pregnant but soon thereafter spontaneously aborted. Shortly afterward, in late 1994, Ms. Daniel became pregnant again.

On January 12, 1995, a standard test for birth defects was administered to Ms. Daniel during a routine prenatal care visit; this test produced an unusually low score. As a result, Ms. Daniel had an ultrasound performed on January 20, which revealed that she was carrying twins with a gestational age of approximately fourteen weeks. On February 9, at her next regular prenatal care visit, Ms. Daniels complained to Dr. Jones (Dr. Pearce's associate) of a backache and of being tired. On February 23, at another regular visit, Ms. Daniels saw Dr. Pearce and she again complained of a backache and of being tired. She declined Dr. Pearce's suggestion of physical therapy.

In an unscheduled visit on March 7, Ms. Daniel complained to Dr. Jones of back pain, a hard stomach, and vaginal itching. She also advised him that she was experiencing what she believed were contractions. Dr. Jones performed a pelvic examination, and he prescribed a cream for relief of her itching symptoms. However, her pain continued, unrelieved. On March 11, Ms. Daniel found it necessary to leave a baby shower early because of the pain that she was experiencing.

On Sunday, March 12, Ms. Daniel's pain increased and included severe back pain and a hard stomach. She called her doctor's emergency telephone number, and she advised Dr. Jenkins (another associate of Dr. Pearce) of her symptoms and that she thought she was having contractions. He recommended that she take aspirin and that she call the office in the morning if her pain continued. Ms. Daniel did not call the doctors' office the next day, but she did ask for a substitute teacher for her elementary school class because she was suffering from too much pain to report to work.

On March 14, Ms. Daniel went to work, but was in so much pain that she had to lie down on the floor before the children came to her classroom. She spent approximately half of the day in the nurse's office at the school, in pain. At approximately nine o'clock that eve-

ning, Ms. Daniel developed a pinkish vaginal discharge. Her husband called the doctors' emergency telephone number on his wife's behalf, and Dr. Pearce returned his call. According to both Mr. and Ms. Daniel, they had reviewed the handbook on pregnancy provided to them by the obstetricians, and, based on the handbook's information, they were concerned that Ms. Daniel's symptoms indicated that she was experiencing preterm labor. Also according to the Daniels -- disputed by Dr. Pearce -- they expressed this concern to Dr. Pearce, who asked if she was having contractions. Ms. Daniel testified that she described her symptoms to Dr. Pearce, advised him that she had had diarrhea for several days, and asked him if she needed to go to the hospital. Dr. Pearce directed her to come to his office the next morning.

Early in the morning of March 15, 1995, Ms. Daniel found herself in extreme pain. She was unable to finish her shower because of the intense pain. Her husband called the Williamsburg Obstetrics office, but his call was not returned (apparently due to an administrative error by the answering service). The Daniels then drove to Walter Reed Emergency Room in Gloucester, Virginia, which has no obstetrical facilities but which was the most accessible hospital under the traffic conditions at the time. A physician at Walter Reed examined her. Finally, at approximately 9:30 a.m., the Walter Reed physician reached Dr. Jones, who instructed him to have Ms. Daniel come by car to the group practice's office. En route to the Williamsburg Obstetrics office, Ms. Daniel's water broke and she began delivery. When Mr. and Mrs. Daniel arrived at the Williamsburg Obstetrics office, Dr. Pearce directed that Ms. Daniel be taken to the nearby Williamsburg Memorial Hospital by ambulance. Within seven minutes of her arrival at the hospital, the first baby was delivered, weighing 505 grams (approximately eighteen ounces). Two minutes later, the second of the twins was delivered, weighing 530 grams. Both of the newborns had heartbeats. However, no neonatal preparations had been made for the twins because preterm delivery was not expected. Within two hours, both of the twins had died.

II.

Ms. Daniel initiated this diversity action in February, 1996, alleging that she suffered physical and emotional injuries due to her obste-

4

tricians' medical malpractice in failing to recognize and properly treat her symptoms of preterm labor. In Virginia, a claim of medical malpractice requires that the plaintiff establish the requisite standard of care, prove a deviation from the standard, and also prove that such deviation was the proximate cause of the asserted damages. See, e.g., Raines v. Lutz, 341 S.E.2d 194, 196 (Va. 1986). Often, but not always, a plaintiff must provide expert opinion to establish the elements of a medical malpractice claim. See Dickerson v. Fatehi, 484 S.E.2d 880, 881-82 (Va. 1997).

In this case, the district court qualified Dr. Robert G. Dillard as an expert witness for the plaintiff. Dr. Dillard is a Professor and Chief of Neonatology in the Department of Pediatrics at Bowman Gray School of Medicine of Wake Forest University in Winston-Salem, North Carolina. He teaches obstetrical residents and medical students about the treatment of high risk patients, including premature labor. Some of Dr. Dillard's former students are now practicing obstetricians in Virginia, and others are obstetrical faculty members at medical schools in Virginia. Dr. Dillard's communications with doctors in Virginia confirmed that professionals in Virginia and North Carolina are taught and in fact apply the same standard of care with respect to the diagnosis and treatment of preterm labor and with respect to the management of high-risk obstetrical patients with twins. He has published articles relating to the management of high-risk obstetrical patients and the diagnosis and treatment of those with preterm labor. Dr. Dillard testified that he is also familiar with professional literature authored by doctors in Virginia on the standard of care with respect to the treatment of premature labor. He participates in the care for women with high-risk pregnancies at a high-volume child delivery service in North Carolina. Dr. Dillard also provides hands-on management of patients, involving diagnosing and treating preterm labor. He jointly formulates, with obstetricians, management plans for women with high-risk pregnancies, including regular reassessment of the patient and consideration of whether to provide her with antibiotics and tocolytic agents.

To establish Dr. Pearce's negligence, Ms. Daniel presented the jury with expert testimony by Dr. Dillard that "on March 14, 1995, [Dr.] Pearce violated the standard of care, essentially ignoring the symptoms that had been ongoing for some period of time and failed to have

5

[Ms. Daniel] examined at that time, rather than in the morning." Two maternal fetal medicine experts who testified for the defense, Dr. Boehm and Dr. Branch, agreed that if the Daniels' version of the facts were correct, the standard of care required Dr. Pearce to have recognized the symptoms of preterm labor on March 14, 1995, and to perform a cervical examination on that date. Also, the handbook Dr. Pearce provided to Ms. Daniel, "ACOG Guide to Planning for Pregnancy, Birth, and Beyond," published by the American College of Obstetricians and Gynecologists, advises under the heading "Signs of Preterm Labor" to "[c]all your doctor right away if you notice . . . vaginal discharge; . . . low, dull backache; abdominal cramps, with or without diarrhea; regular contractions or uterine tightening," and further states that "[a cervical examination] is the only way to confirm preterm labor."

On the issue of proximate cause of injury, Dr. Dillard testified that, in his opinion and to "[a reasonable degree of medical certainty] the failure to diagnose and treat [Ms. Daniel's] preterm labor resulted in her pain and physical injury prior to March 15th." Had Ms. Daniel been correctly diagnosed, her pain would likely have been ameliorated, indeed, Dr. Pearce testified that his practice's success rate with the use of tocolytic drugs[3] in treating preterm labor is greater than ninety percent.

III.

On appeal, Dr. Pearce raises three issues. First, he contends that the district court abused its discretion by qualifying Dr. Dillard as an expert witness. We review the district court's decision to qualify a witness as an expert for "manifest error." See, e.g., Salem v. United States Lines Co., 370 U.S. 31, 35 (1962) (citation omitted) (stating that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous."); Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) (citation omitted).

_____

[3] "Tocolysis" is the inhibition of uterine contractions. Dorland's Illustrated Medical Dictionary 1716 (28th ed. 1994).

The district court viewed as controlling the Virginia statute governing the qualifications of an expert witness in a medical malpractice case.[4] The court found that Dr. Dillard regularly deals in high-risk pregnancies with the goal of extending those pregnancies as long as possible, and concluded that by doing so, Dr. Dillard demonstrated his expert knowledge of the standards of Dr. Pearce's specialty in Virginia, as required by the statute. The district court further found that, despite extensive pre-trial discovery and proceedings to test Dr. Dillard's credentials, Dr. Pearce "never evoked a scintilla of evidence to suggest that [Dr.] Dillard does not know the standard of care." The district court noted that two eminently qualified defense expert obstetrician witnesses corroborated Dr. Dillard's testimony as to the negligence, assuming the facts testified to by Ms. Daniel. He also praised highly both the quality and the clarity of the expert testimony presented by both sides in this case.

Next, Dr. Pearce asserts that the district court's denial of his motions for judgment as a matter of law, or for a new trial in the alternative, was error. He claims there was insufficient evidence to establish that Ms. Daniel experienced a compensable injury under Virginia law and that her injury was proximately caused by Dr. Pearce's deviation from the standard of care. We review de novo the denial of a motion for judgment as a matter of law, to determine whether substantial evidence exists upon which the jury could find for the appellee, viewing the evidence in the light most favorable to the non-moving party, in this case, Ms. Daniel. See Benedi v. McNeil-P.P.C.,

_____

[4] The district court applied the Virginia standard for qualifying an expert to the admission of Dr. Dillard's testimony. Under the Federal Rules of Evidence, either of two standards might apply to the question of expert qualification in certain diversity cases. In a civil action in which state law supplies the rule of decision, the competency of a witness shall be determined in accordance with that law. Fed. R. Evid. 601; cf. Fed. R. Evid. 702 (federal courts' standard for testimony by experts); see also Ralph v. Nagy, 950 F.2d 326, 328-29 (6th Cir. 1991) (noting, but not deciding between, two different standards for qualifying an expert in a medical malpractice case); Peck v. Tegtmeyer , 834 F. Supp. 903, 908-09 (W.D. Va. 1992) (concluding that Virginia law governs the qualification of an expert witness in medical malpractice action). We need not decide which standard is appropriate here, because our decision does not turn on any distinction between the Virginia rule and the federal rule.

Inc., 66 F.3d 1378, 1382 (4th Cir. 1995). We review the denial of a motion for a new trial for abuse of discretion. Id.

On the issue of whether Ms. Daniel experienced compensable injury, the district court found in its written opinion that the record is "replete with testimony describing the [physical] pain experienced by plaintiff between March 7, 1995, and the delivery date, March 15, 1995," and described that testimony with several pages of detail. The district court further described other witnesses' corroborating testimony on the issue. Virginia law plainly recognizes extreme physical pain and discomfort as compensable physical injury. See, e.g., Howard v. Alexandria Hosp., 429 S.E.2d 22, 25 (Va. 1993) (holding that plaintiff's evidence of physical pain and discomfort experienced due to post-negligence prophylactic treatment was "positive, physical . . . hurt to the claimant" that established a prima facie case of physical injury); Modaber v. Kelley, 348 S.E.2d 233, 237 (Va. 1986) (affirming that the aggravated effects of a mother's pregnancy condition, due to the obstetrician's inaction, and the physical pain caused to the mother by injury to her unborn child, were compensable injury).

On the issue of causation, the district court found that there was sufficient evidence to support the jury's verdict, in that Dr. Dillard specifically testified about Dr. Pearce's breach of the standard of care and the direct causal relationship between that breach and plaintiff's physical and emotional experiences. The district court concluded that sufficient evidence supported the jury's verdict in favor of Ms. Daniel.

Finally, Dr. Pearce argues that the district court abused its discretion by refusing to consider as evidence for purposes of Dr. Pearce's motion for a new trial a post-trial affidavit that purported to undermine Dr. Dillard's professional qualifications. This issue inextricably relates to the admissibility of Dr. Dillard's testimony, and, as we have noted, we review the district court's evidentiary rulings for abuse of discretion. Id. In this instance, the district court concluded that Dr. Pearce had ample notice of the plaintiff's intention to rely on Dr. Dillard's expert testimony, and that Dr. Pearce had presented no basis to justify admitting the post-trial affidavit. Reviewing this issue for an abuse of discretion, we are unable to conclude that the district court

8

erred when it refused to consider the affidavit in connection with the request for a new trial.

IV.

We have carefully considered the briefs and oral argument presented on behalf of the parties to this appeal, and we have thoroughly examined the record pertinent to their respective positions. We find no reversible error, and we are content to adopt the comprehensive opinion of the district court and affirm on its reasoning. See Daniel v. Jones, No. 4:96CV24 (E.D. Va. Feb. 19, 1999).

AFFIRMED

9